EDWARD H. KUBO, JR.   2499
United States Attorney
District of Hawaii

LAWRENCE L. TONG  3040
Assistant U.S. Attorney
Room 6-100, PJKK Federal Building
300 Ala Moana Boulevard
Honolulu, Hawaii  96850
Telephone: (808) 541-2850
Facsimile: (808) 541-2958
Email: Larry.Tong@usdoj.gov

LAWRENCE A. GOYA  2476
Special Assistant U.S. Attorney
425 Queen Street, Third Floor
Honolulu, Hawaii 96813
Telephone: (808) 586-1160
Facsimile: (808) 586-1375
E-Mail: Lawrence.A.Goya@hawaii.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. 04-00243 DAE |
| | ) | |
| Plaintiff, | ) | |
| | ) | GOVERNMENT'S TRIAL |
| vs. | ) | MEMORANDUM; CERTIFICATE OF |
| | ) | SERVICE |
| MICHAEL FURUKAWA,        (01) | ) | |
| WESLEY UEMURA,           (02) | ) | Trial: September 20, 2006 |
| DENNIS HIROKAWA,         (03) | ) | |
| RICHARD OKADA,           (04) | ) | |
| | ) | |
| Defendants. | ) | |

**TABLE OF CONTENTS**

PAGE(S)

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . ii

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . 1

II.  FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . 3

     A.  The Honolulu International Airport's Maintenance
         Section . . . . . . . . . . . . . . . . . . . . . 3

     B.  The Small Purchase Contract Procurement Process . . 5

     C.  The Bid-Rigging and Kickback Scheme . . . . . . . 7

     D.  Other Co-Conspirators . . . . . . . . . . . . . . 11

     E.  The Small Purchase Contracts Awarded to
         Defendants . . . . . . . . . . . . . . . . . . . 18

     F.  The Criminal Investigation, and the Defendants'
         Attempt to Conceal Their Activities . . . . . . . 19

III. APPLICABLE LAW . . . . . . . . . . . . . . . . . . . . 21

     A.  Conspiracy . . . . . . . . . . . . . . . . . . . 21

     B.  Co-Conspirator Statements . . . . . . . . . . . . 24

     C.  Mail Fraud . . . . . . . . . . . . . . . . . . . 26

         1.  Scheme to Defraud . . . . . . . . . . . . . . 26

         2.  Mailings in Furtherance of the Scheme . . . . . 29

IV.  EVIDENTIARY ISSUES . . . . . . . . . . . . . . . . . . 30

TABLE OF AUTHORITIES

FEDERAL CASES

PAGE(S)

Bourjaily v. United States, 483 U.S. 171 (1987)    . . .    24

Davis v. United States, 12 F.2d 253 (5th Cir.),
    cert. denied, 271 U.S. 688 (1926) . . . . . . . . .    27

Glasser v. United States, 315 U.S. 60 (1942)    . . . . .    24

Levey v. United States, 92 F.2d 688 (9th Cir. 1937),
    cert. denied, 303 U.S. 639 (1938) . . . . . . . . .    28

Neder v. United States, 527 U.S. 1 (1999)    . . . . . .    27

Pereira v. United States, 347 U.S. 1 (1954)    . . . . .    29

Robinson v. United States, 33 F.2d 238 (9th Cir. 1929) .    27

Schmuck v. United States, 489 U.S. 705 (1989) . . . . .    30

United States v. Arambula-Ruiz, 987 F.2d 599,
    (9th Cir. 1993) . . . . . . . . . . . . . . . . . .    25

United States v. Beecroft, 608 F.2d 753
    (9th Cir. 1979)  . . . . . . . . . . . . . . . . .  23, 26

United States v. Benny, 786 F.2d 1410 (9th Cir.),
    cert. denied, 479 U.S. 1017 (1986) . . . . . . . . .    30

United States v. Bernhardt, 840 F.2d 1441 (9th Cir.),
    cert. denied, 488 U.S. 954 (1988) . . . . . . . . . .    29

United States v. Bibbero, 749 F.2d 581 (9th Cir. 1984),
    cert. denied, 471 U.S. 1103 (1985) . . . . . . . . .    22

United States v. Bohonus, 628 F.2d 1167 (9th Cir.),
    cert. denied, 447 U.S. 928 (1980) . . . . . . . . . .    26

United States v. Brackenridge, 590 F.2d 810
    (9th Cir. 1979) . . . . . . . . . . . . . . . . . .    29

United States v. Bridgeforth, 441 F.3d 864
    (9th Cir. 2006) . . . . . . . . . . . . . . . . . .    24

PAGE(S)

United States v. Castro, 972 F.2d 1107
   (9th Cir. 1992) . . . . . . . . . . . . . . . . . 22, 23

United States v. Craig, 573 F.2d 455 (7th Cir. 1977),
   cert. denied, 439 U.S. 820 (1978) . . . . . . . . . 28

United States v. Diggs, 649 F.2d 731 (9th Cir.),
   cert. denied, 454 U.S. 970 (1981) . . . . . . . . . 28

United States v. Escalante, 637 F.2d 1197 (9th Cir.),
   cert. denied, 449 U.S. 856 (1980) . . . . . . . . . 23

United States v. Farris, 614 F.2d 634 (9th Cir. 1979),
   cert. denied, 447 U.S. 926 (1980) . . . . . . . . . 28

United States v. Federbush, 625 F.2d 246
   (9th Cir. 1980) . . . . . . . . . . . . . . . . . 27

United States v. Fleishman, 684 F.2d 1329 (9th Cir.),
   cert. denied, 459 U.S. 1044 (1982) . . . . . . . . . 25

United States v. Garza, 980 F.2d 546 (9th Cir. 1992) . . 25

United States v. Gil, 58 F.3d 1414 (9th Cir. 1995),
   cert. denied, 516 U.S. 969 (1995) . . . . . . . . . 25

United States v. Green, 523 F.2d 229 (2d Cir. 1975),
   cert. denied, 423 U.S. 1074 (1976) . . . . . . . . . 23

United States v. Hernandez, 876 F.2d 774 (9th Cir.),
   cert. denied, 493 U.S. 863 (1989) . . . . . . . . . 22

United States v. Hobson, 519 F.2d 765 (9th Cir.),
   cert. denied, 423 U.S. 931 (1985) . . . . . . . . . 23

United States v. Hubbard, 96 F.3d 1223
   (9th Cir. 1996) . . . . . . . . . . . . . . . . . 30

United States v. Johnson, 297 F.3d 845
   (9th Cir. 2002) . . . . . . . . . . . . . . . . 22, 26

United States v. Jones, 425 F.2d 1048 (9th Cir.),
   cert. denied, 400 U.S. 823 (1970) . . . . . . . . . 28

United States v. Larson, ___ F.3d ___, 2006 WL 2466872
   (9th Cir. August 28, 2006) . . . . . . . . . . . . 25

PAGE(S)

United States v. LeVeque, 283 F.3d 1098
(9th Cir. 2002) . . . . . . . . . . . . . . . . . . . 27

United States v. Maze, 414 U.S. 395 (1974) . . . . . . 29

United States v. Miller, 471 U.S. 130 (1985) . . . . . 28

United States v. Monroe, 552 F.2d 860 (9th Cir.),
cert. denied, 431 U.S. 972 (1977) . . . . . . . . . 22

United States v. Montgomery, 384 F.3d 1050
(9th Cir. 2004) . . . . . . . . . . . . . . . . . . . 26

United States v. Nelson, 66 F.3d 1036
(9th Cir. 1995) . . . . . . . . . . . . . . . . . . . 22

United States v. Perry, 550 F.2d 524 (9th Cir.),
cert. denied, 431 U.S. 918, 434 U.S. 827 (1977) . . 23

United States v. Piepgrass, 425 F.2d 194
(9th Cir. 1970) . . . . . . . . . . . . . . . . . . . 27

United States v. Price, 623 F.2d 587 (9th Cir.),
cert. denied, 449 U.S. 1016 (1980) . . . . . . . . . 28

United States v. Rasheed, 663 F.2d 843 (9th Cir. 1981),
cert. denied, 454 U.S. 1157 (1982) . . . . . . . . . 27

United States v. Restrepo, 930 F.2d 705
(9th Cir. 1991) . . . . . . . . . . . . . . . . . . . 23

United States v. Sayakhom, 186 F.3d 928
(9th Cir. 1999) . . . . . . . . . . . . . . . . . 26, 27

United States v. Segura-Gallegos, 41 F.3d 1266
(9th Cir. 1994) . . . . . . . . . . . . . . . . . . . 24

United States v. Serang, 156 F.3d 910 (9th Cir.),
cert. denied, 525 U.S. 1059 (1998) . . . . . . . . . 30

United States v. Shipsey, 363 F.3d 962 (9th Cir.),
cert. denied, 543 U.S. 1004 (2004) . . . . . . . . . 26

United States v. Thomas, 586 F.2d 123
(9th Cir. 1978) . . . . . . . . . . . . . . . . . . . 23

United States v. Umagat, 998 F.2d 770
(9th Cir. 1993) . . . . . . . . . . . . . . . . . . . 22

iv

PAGE(S)

<u>United States v. Weaver</u>, 594 F.2d 1272
    (9th Cir. 1979)  . . . . . . . . . . . . . . . . . . . .  24

<u>United States v. Wilson</u>, 506 F.2d 1252
    (7th Cir. 1974)  . . . . . . . . . . . . . . . . . . . .  28

**FEDERAL STATUTES AND RULES**

18 U.S.C. § 371 . . . . . . . . . . . . . . . . . . . . . .  21

Fed. R. Evid. 104(a)  . . . . . . . . . . . . . . . . . . .  25

Fed. R. Evid. 801(d)  . . . . . . . . . . . . . . . . . . .  24

Fed. R. Evid. 801(d)(2)(E) . . . . . . . . . . . . . . . .  24

GOVERNMENT'S TRIAL MEMORANDUM

The United States submits this memorandum to aid the court in presiding over the trial of this case.

I.   INTRODUCTION

This case arises out of fraud and corruption in the award of "small purchase contracts" for maintenance and repair work at the Honolulu International Airport.  The superseding indictment alleges that, from July 1, 1997 through June 30, 2002, the four defendants and others participated in a bid-rigging scheme which resulted in contracts being awarded to favored contractors at inflated prices.  The indictment further alleges that some of the contractors involved paid kickbacks and gratuities to State employees in return for the contracts.  The State employees characterized some of the kickbacks as being "donations" which would be used to make political contributions. All four defendants are charged with conspiring to commit mail fraud, and three of the defendants are charged with substantive mail fraud violations as well.

The defendants in this case are Michael Furukawa, Wesley Uemura, Dennis Hirokawa and Richard Okada.  Furukawa and Uemura were licensed contractors whose companies obtained substantial business at the airport.  Hirokawa was an engineer in, and later the head of, the airport maintenance section. Hirokawa used his positions to steer business to Furukawa, Uemura and other contractors.  Hirokawa also solicited kickbacks and donations from some of those contractors.

Okada, who is Furukawa's cousin, was the administrator of the State airport's Visitor Information Program. This program provided services to tourists and visiting dignitaries. Although not officially involved in the award of the small purchase contracts, Okada took various acts to further the conspiracy in this case. Among other things, Okada encouraged inspectors to identify additional work to be given to contractors. Okada also encouraged contractors to inflate their prices, and solicited and accepted cash and "political contributions" from contractors who received the work.

The bid rigging and kickback scheme affected the integrity of the contracting process, and caused economic harm to State taxpayers. The scheme allowed participating contractors to inflate their bids substantially above the reasonable value of the work performed. At trial, the government will present detailed evidence on 45 small purchase contracts awarded to Furukawa or Uemura's companies. The government will show that Furukawa and Uemura were paid a total of $418,723 for those jobs. An expert retained by the government will testify that the reasonable value of that work was approximately ten percent of that amount.

The government will introduce evidence that the State paid inflated amounts on small purchase contracts awarded to other individuals who agreed to pay kickbacks to Hirokawa and Okada. A number of other contractors will testify that they

gave cash to Hirokawa and Okada, and purchased food and other items at their direction.  These contractors will further testify that they recouped these costs by inflating their bids on airport jobs.

II.  FACTUAL BACKGROUND

    A.   The Honolulu International Airport's
        Maintenance Section

        At all times relevant to this case, the Honolulu International Airport was operated and maintained by the State of Hawaii, Department of Transportation, Airports Division.  The airport had its own operational budget, a portion of which was allocated to maintenance.  The airport had a maintenance section, which was responsible for maintaining all airport facilities, including buildings, grounds, roads, runways, and equipment.  The section had three primary units: (1) a facilities maintenance unit, (2) an airfield and grounds maintenance unit, and (3) a contract maintenance services unit, also known as the Oahu district Maintenance Engineer (OME).[1]  The facilities maintenance

---

      [1]   The maintenance section had a fourth unit called the maintenance services unit.  This unit had administrative personnel who were responsible for processing paperwork, including requisitions, purchase orders and invoices.

3

unit did plumbing, carpentry and painting work at the airport, whereas the airfield and grounds maintenance unit was responsible for landscaping, grounds and automobile maintenance. Each unit had full-time, skilled workers to handle scheduled or emergency maintenance work at any time of the day or night.

The contract maintenance services unit, or OME, was staffed by engineering and administrative personnel. OME was primarily responsible for providing contract administration services. The unit inspected airport facilities, provided job specifications, inspected the work, and processed the paperwork necessary for payment. The unit was headed by an engineer, and included a supervising inspector and several inspectors.

The maintenance units all reported to the airport construction and maintenance superintendent. Prior to September 1998, Mel Ikeda served as maintenance superintendent. Defendant Hirokawa was an engineer in the OME, and thus reported to Ikeda. When Ikeda retired, Hirokawa became acting maintenance superintendent, where he assumed overall responsibility for the maintenance work at the airport. Hirokawa took the position on a regular basis in April 1999, and remained there until he took administrative leave in late June 2002, after an investigation into his activities began escalating.[2]

---

[2] Hirokawa subsequently retired.

4

B.    The Small Purchase Contract Procurement
      Process

An airport maintenance or repair project was usually
initiated through the preparation of a "trouble call."  A
trouble call described the nature and location of a problem, and
the date on which it was noticed.  Photographs of the area
needing repair were often attached.  Trouble calls could be
initiated by anyone at the airport, but were usually filled out
by inspectors in the maintenance section.  Trouble calls were
routed to the maintenance superintendent for action.  The
maintenance superintendent would route the trouble calls to
maintenance units, depending on the nature of the work.  Thus, a
plumbing or carpentry issue might be routed to the facilities
maintenance unit, whereas a problem with landscaping or vehicles
would go the airfield and grounds maintenance unit.   The unit
chiefs would indicate whether they could handle the work in-
house.  If the work was done in-house, it would be done by
salaried State employees.  The State thus would have to pay for
materials, but would not incur labor costs.

In some cases, the maintenance units would recommend
that the work be done by outside contractors.  This would
normally occur where the work would be so time-consuming as to
prevent the units from handling other routine maintenance work.
If a project had to be done by an outside vendor, the matter
would be referred to the OME for bids.  OME would estimate the

value of the work, and solicit quotes from outside vendors, in accordance with State of Hawaii procurement laws.

The procurement process varied according to the size of the contract.  If a contract exceeded $25,000, it could be awarded only via a competitive, sealed bid process.  By contrast, a "small purchase contract" having a value of less than $25,000 could be awarded through a streamlined purchase order process.  A State contracting official was required to identify the work, obtain quotes from three qualified vendors, identify the low bidder, and then submit a purchase requisition for the contract. If it was approved, a purchase requisition and purchase order would be issued.  The vendor or contractor submitting the low bid would then receive notice to proceed with the work.  When the work was completed, the contractor would submit an invoice to the department seeking the work.  A contracting official was required to inspect the work, and approve the bill for payment.  The bill would be paid with public money, through a check issued by the State Department of Accounting and General Services (DAGS).

In the case of the airport work, the OME would solicit three bids, and then seek a purchase requisition.  The requisition would be approved by the maintenance superintendent, who would recommend approval of the Oahu district airports manager.  Once the requisition was approved, a purchase order would be issued.  When the work was completed, and a contractor submitted an invoice, the OME and maintenance superintendent

6

would recommend approval of the manager again.  When the manager
approved payment, DAGS would generate a check, which would be
mailed to the vendor.

     C.    <u>The Bid-Rigging and Kickback Scheme</u>

        The superseding indictment alleges that, from July 1,
1997 through June 30, 2002, the defendants and others engaged in
a bid-rigging scheme to circumvent the State procurement laws in
connection with repair work at the airport.

        Hirokawa was involved in the assignment of work to
outside vendors, both as a maintenance engineer in OME, and later
as maintenance superintendent.  When he became acting maintenance
superintendent in September 1, 1998, Hirokawa took steps to
increase the amount of work awarded to outside vendors.  Hirokawa
actively encouraged inspectors to identify areas at the airport
in need of repair work.  Okada also told inspectors to look for
additional repair work to be done.[3]  The inspectors thus began to
submit greater numbers of trouble calls to the maintenance
section.  In some cases, Hirokawa himself also prepared trouble
calls identifying areas needing repairs.

        As noted above, trouble calls were previously routed to
the maintenance unit chiefs for a determination of whether the
work could be done in-house, by salaried State employees.  When
he became maintenance superintendent, however, Hirokawa largely

---

     [3]  Although Okada was not part of the maintenance section,
he was perceived to have political influence and, therefore, the
inspectors and others tended to follow his directives.

stopped sending the trouble calls to the unit chiefs. Hirokawa
instead started assigning a large portion of the work to outside
vendors.[4] Hirokawa would give the trouble calls to Harry
Shibuya, the supervising inspector in the maintenance section.[5]
Although the work had not been put out to bid, Hirokawa usually
put a "post-it" note on each trouble call, indicating the
contractor to whom the job should be given.

Hirokawa typically directed the work to a small group
of individuals. Many jobs were given to companies owned by
defendants Furukawa and Uemura.[6] Furukawa was president of M.F.
Masonry, Inc. and Argent Construction, Inc., and a company
officer for the Kenlee Limited Liability Company. Uemura was a
licensed contractor who did business as Wes' Contracting, and was
also president of Hammer Jammers, Inc. Furukawa and Uemura

---

[4] One of more of the maintenance personnel will testify
that the maintenance units had the capabilities to do much of the
work given to outside vendors.

[5] Prior to early 1999, Robert Lee was supervising
inspector. In 1999, Hirokawa hand picked Shibuya to take Lee's
job. When the position became available, Hirokawa provided
Shibuya with the questions and answers which would be used at a
promotional board interview. Shibuya has pled guilty to State
theft charges in connection with the bid-rigging conspiracy, and
he is identified as an unindicted co-conspirator in this case.
As part of his plea agreement with the State, Shibuya will
testify in this case.

[6] As the scheme grew, it became more obvious that a select
number of contractors were getting a large share of the work.
Defendant Richard Okada thus told Furukawa, Uemura and other
participating contractors to form multiple companies. In 1998,
Furukawa thus formed Argent Construction in 1998, and Uemura
formed Hammer Jammers. In 1999, Furukawa formed KenLee.

jointly owned yet another company called Gothic Builders, Inc.
M.F. Masonry, Argent, Kenlee, Wes' Contracting, Hammer Jammers
and Gothic all received a substantial number of small purchase
contracts at the airport.[7]

Shibuya would contact the individual selected by
Hirokawa about a particular maintenance job.  Each contractor had
been instructed that State procurement laws required the
submission of three competing bids before a small purchase
contract could be awarded.  Each contractor was told to submit
not only his own bid, but also two bids from other contractors.
The contractor pre-selected to receive the work thus submitted a
package of three bids to Shibuya.  The pre-selected contractor
always submitted the lowest bid.  The contractor then submitted
two higher bids – known as "complementary bids" – from other
contractors.  These bids were on the letterhead of other
contractors, and made it appear as if those contractors wanted
the work.  In reality, the bids were bogus.  In some cases,
Furukawa or Uemura obtained the letterhead of other companies and
submitted fabricated bids in their names, without the other

---

[7]  A number of jobs were also given to companies owned by
Arthur Inada, Bert Shiosaki, Roy Yoshida, Herbert Hirota and Roy
Shimotsukasa, who are not named as defendants in this case.  As
will be discussed below, these individuals have pled guilty to
State theft charges growing out of the bid rigging scheme.  Each
individual has agreed to cooperate with the government, and will
be a witness in this case if necessary.

companies' knowledge or consent.[8]  In other cases, Furukawa and Uemura submitted "complementary bids" on each other's behalf, knowing full well that one of their companies had been pre-selected as the contractor on the job.

The use of such collusive bids gave the illusion that three contractors were competing for each job, whereas in fact there was no competition at all.  The winning contractor knew he had been pre-selected by Hirokawa, and controlled all three bids. This permitted each contractor to inflate his bids above the fair and reasonable value of the work.

In return for awarding the work, Hirokawa and Okada

---

[8]  Furukawa and Uemura often submitted complementary bids purportedly made by B & U, Inc., Site Engineering, Thomas T. Takeshita & Sons, and Home Contractors.  These contractors will testify that they had a connection with either Furukawa or Uemura. Alaric Sokugawa, the retired owner of B & U, had previously employed Furukawa.  Sokugawa will testify that Furukawa asked him to sign blank proposals on B/U's letterhead. Sokugawa had no desire to do the work, but signed the proposals out of friendship to Furukawa.  Reuben Takeshita, owner of Thomas T. Takeshita & Sons, will  testify that he gave a few blank proposals on his company's letterhead to Furukawa.  Takeshita understood that Furukawa would tell him whenever there was a job to bid on, and discuss the bid with him.  Furukawa instead submitted proposals bearing Takeshita's letterhead without Takeshita's knowledge or consent.  Michael Masutani, owner of Site Engineering, will also testify he did not make or submit any of the Site Engineering bids which were used to support Furukawa and/or Uemura's winning bids at the airport.  Masutani did, however, give a few blank proposals to another contractor who submitted complementary bids on behalf of Bert Shiosaki, an accomplice who will testify in this case.  Ben Ohta, former draftsman of Home Contractors, will also testify that the company did not make any of the bids submitted in support of Furukawa and/or Uemura's winning bids.  Dawn Takara, the daughter of Home Contractors' now deceased owner, will testify that her father frequently used defendant Uemura as a subcontractor on his jobs.

solicited kickbacks and gratuities from the winning contractors.
In some instances, the contractors were given invoices for
parties and other functions.  Contractors were also asked to
provide food for parties at the OME.  Contractors were also asked
for cash payments, which were paid both to Hirokawa and Okada.
Moreover, Okada asked several contractors to make cash payments
for "political donations," and to pay the costs of catering food
at the State legislature.  Okada encouraged contractors to
inflate their bids to cover the cost of the kickbacks.

     D.   <u>Other Co-Conspirators</u>

       A number of participants in the scheme have pled guilty
to State theft charges, and have entered plea agreements pursuant
to which they will testify in the federal case.  Shibuya, the
former supervising inspector, will testify about how Hirokawa
selected contractors before putting the jobs out to bid, and
about the overall working of the conspiracy.  A number of
contractors will also testify about the bid rigging and kickback
scheme.  These contractors include: (1) Arthur Inada, the owner
of Blueprint Builders, Inc., and AP Maintenance; (2) Bert
Shiosaki, the president of CBS Electric, Inc.; (3) Roy Yoshida of
Yoshida Auto Paint Shop; (4) Herbert Hirota of Hirota Painting
Company; and (5) Roy Shimotsukasa, president of AAA Termite and
Pest Control.  Each of these individuals will testify that he was
preselected to obtain small purchase contracts, submitted bids
and "complementary bids" to make it appear as if procurement laws

were being followed, and then was asked for and/or paid kickbacks to Hirokawa or Okada for the work.

Inada's companies, Blueprint Builders and AP Maintenance, obtained numerous small purchase contracts issued at the airport.  Inada was introduced to airport work by Furukawa, a friend of his.  Furukawa told him that, in addition to submitting his bid, Inada had to submit bids from two other contractors to make it appear that State procurement laws were being followed. Inada thereafter began submitting a package of three bids on each job.  One bid was from his company.  The other two bids were fictitious bids from contractors who were not actually competing for the work.  Inada usually obtained complementary bids from Furukawa and Uemura.  The three individuals understood that Inada would submit the low bid, and that on other jobs the roles would be reversed, with Inada submitting a higher, complementary bid.

Hirokawa and Okada asked Inada for kickbacks in return for the award of the work.  Inada provided food for OME lunches and parties.  Inada also initially paid Hirokawa $500 for each job which he received.  When Hirokawa became demanding and persistent, Inada began making the payments to Okada.  After a period of time, Inada began paying $2,000 each month to Okada, on the assumption that he would receive approximately four jobs each month.

Okada also solicited substantial "political contributions" from Inada.  Inada made two such payments of

12

$20,000 each.  In total, Inada calculated that he paid more than
$129,000 to Hirokawa or Okada.  The payments included both the
kickbacks and the political contributions.  Most of the payments
were made in cash, because Okada said cash was harder to trace.
Other payments took the form of Inada's purchase of items at
stores such as Costco and Marukai Wholesale, all of which were
done at Okada's direction and were characterized as being for
"political donations."  While the scheme was ongoing, Okada told
Inada to include all of his "expenses" in his invoices.  Inada
thus will testify that he inflated his invoices to the State to
cover the cost of the kickbacks paid to Hirokawa and Okada.

          Shiosaki will give similar testimony.  Shiosaki is
owner of CBS Electric, Inc., a company which he formed in 1998.
Hirokawa was a friend of Shiosaki's father.  Hirokawa asked
whether Shiosaki was interested in performing electrical work at
the airport.  When Shiosaki said he was interested, Hirokawa had
Robert Lee (Shibuya's predecessor as supervising inspector) call
him.  On the first job, Shiosaki submitted only one bid.  Lee
told him he needed to submit a package of three bids to get the
job.  Lee made it clear that, if contacted about a job, Shiosaki
had to submit his own bid and two "complementary" bids.  As a
result, Shiosaki solicited the cooperation of two other electric
companies whose owners he knew.  Shiosaki obtained copies of
their letterhead, and began submitting bids on their letterhead,
even though those companies had no intention of bidding on the

13

work.  Shiosaki's bid was always the lowest, and the other bids were intended to make it appear as if the job had been put out to competitive bidding.

Shiosaki knew there was no real competition for the jobs, and that his bills would not be scrutinized.  Shiosaki thus inflated his bids above the reasonable value of the work.  In return for the jobs, Hirokawa asked Shiosaki for cash contributions, supposedly to cover the costs of political functions.  The largest single contribution which Shiosaki gave was for $5,000.  At Hirokawa's request, Shiosaki also did electrical work on Okada's home.  Shiosaki did what Hirokawa asked, as he was afraid he would otherwise not obtain additional electrical work at the airport.

Hirota was the owner of Hirota Painting Company, Inc. In the early 1990s, Hirota met Hirokawa while competing for sealed bid work at the airport.  Hirokawa was a maintenance engineer at the time, and would usually meet the competing contractors at mandatory site visits.  In 1997 or so, Hirokawa began calling Hirota about small purchase contracts, or purchase orders, having a value of less than $25,000.  Hirokawa would ask Hirota for bids on certain projects.  Hirokawa would review the bids, and if they were acceptable, he would instruct Hirota to submit a formal bid.  Hirokawa told Hirota he need to submit two "complementary" bids from other contractors as well.  Hirota would contact two other painting contractors who were willing to

14

submit complementary bids.  Hirota told the contractors the
amount of his bid, and they understood that their bids were to be
higher.  The contractors agreed to submit such bids, because they
would seek similar complementary bids from Hirota on other non-
airport jobs.

      Hirota would provide the package of three bids to the
airport maintenance section.  Hirota knew that he would always be
the low bidder, and was guaranteed the contract.[9]

      After awarding him some small purchase contracts,
Hirokawa began to ask Hirota for money and favors.  Hirokawa
initially gave Hirota receipts for services such as catering, and
asked him to pay them.  Hirota did so.  Hirokawa gave Hirota the
impression that the receipts were for political functions.  At a
later point, Hirokawa asked Hirota to give him a $5,000 political
contribution.  This request came around 1998, during a contested
gubernatorial campaign.  Hirota thereafter gave Hirokawa $5,000
in cash. Hirota made the payment both to get additional small
purchase contracts, and to maintain good relations with Hirokawa,
who also had a role in sealed bid work that Hirota was continuing
to do.  Hirota thought he would not continue to get airport work
if he failed to make the payment.

      Shimotsukasa was president of AAA Termite and Pest

---

[9]  Airport records reflect that Hirota received $24,980 in
small purchase contracts during fiscal year ending June 30, 1998,
$47,138.13 in fiscal year 1999, and $11,158.11 in fiscal year
2000.

Control, Inc., a Kaneohe-based exterminating contractor.
Shimotsukasa met Hirokawa when he was approached by inspector
Robert Lee, Shibuya's predecessor, about smaller jobs.  When
Shimotsukasa submitted his first bid, he was told to increase the
price.  Shimotsukasa was told that his bids should be increased
until they were close to the $25,000 limit allowed by Hawaii
procurement laws.  Shimotsukasa was told that, in order to get
the work, he was expected to submit not only his own bid, but
also two "complementary" bids.  Shimotsukasa thereafter obtained
the cooperation of two other termite and pest control business
whose owners he knew.  When called on jobs, Shimotsukasa would
submit his own bid, and two other bids from these companies.
Shimotsukasa expected to be the winning bidder, as his bid was
always the lowest.

     Hirokawa solicited kickbacks from Shimotsukasa after
giving him several jobs.  Hirokawa suggested that Shimotsukasa
pay him $500 for each $10,000 that he billed the State for
airport work.  Shimotsukasa agreed to make the payments, and paid
Hirokawa between $4,000 and $5,000 in kickbacks during the time
covered by the superseding indictment.  The payments were made in
$1,000 increments.

     Yoshida was owner of Yoshida Auto Paint Shop, which did
paint and body work on automobiles.  Yoshida was a high school
friend of Furukawa.  Yoshida knew that Furukawa was a cousin of
Okada, who he understood was able to influence the award of jobs.

Yoshida had also known Okada for more than 30 years, from when they were both children.

Furukawa instructed Yoshida on the process to be followed in getting the airport jobs.  When the airport maintenance section requested a quotation, Yoshida was expected to provide not only his own bid, but also two "courtesy" bids from other auto paint businesses.  Yoshida thereafter obtained bids from two other paint shops, who agreed to give Yoshida bids that were more expensive than his.  Yoshida understood that he would get particular jobs because of his association with Furukawa and Okada, and regarded the provision of the three bids as a formality.

Furukawa and Okada told Yoshida to inflate his bills. Okada told Yoshida to double the amount of his bills, and not to leave anything on the table.  Yoshida did not double his bills, but over billed the airports maintenance section by approximately $6,500 during the period covered by the superseding indictment. Yoshida also did various favors for Okada, including helping him move homes, helping to paint one of his homes, and canvassing the Manoa and Pacific Heights areas during a gubernatorial election campaign.

Furukawa, Okada and Uemura often went to Yoshida's shop, where they drank beer at a picnic table in back.  Furukawa and Uemura admitted inflating their invoices for airport work, and making kickbacks to Okada for political contributions.

17

Furukawa approached Yoshida about making donations, but Yoshida declined.  Yoshida did various favors for Okada, including helping him move homes, helping to paint one of his homes, and canvassing the Manoa and Pacific Heights areas during a gubernatorial election campaign.

      E.    The Small Purchase Contracts Awarded to Defendants

The superseding indictment references 45 small purchase contracts awarded to Furukawa or Uemura's companies.  These contracts were either identified in substantive mail fraud counts, or as overt acts in furtherance of the conspiracy.  The contracts were broken down into four general categories: (1) terrazzo repair work; (2) ceramic tile repairs; (3) concrete patching work; and (4) miscellaneous repairs.

The government has retained the services of Kenneth Goldblatt as an expert witness in this case.  Goldblatt is a civil engineer with more than 35 years of experience in project management, construction, estimating and forensic engineering. Goldblatt has inspected the work done by Furukawa and Uemura's companies in respect to the 45 small purchase contracts. Goldblatt is expected to testify that the reasonable value of the repair work was approximately 10% of the $418,723 which was paid.

      F.    The Criminal Investigation, and the
           Defendants' Attempt to Conceal Their
           Activities

The airport worked on a fiscal year basis, from July 1 through June 30.  In July 1999, airport auditors were notified

18

about discrepancies in the expenditures by the airport
maintenance section for the fiscal year ending June 30, 1999
("fiscal year 1999").  The auditors were advised that the
maintenance section had exceeded its budget for fiscal year 1999.
The maintenance section thus sought to cancel certain purchase
encumbrances, and to transfer approximately $2.125 million in
purchase orders from fiscal year 1999 to fiscal year 2000.
Airport auditors then met with Hirokawa and representatives of
the maintenance section, and developed a spreadsheet to track
spending by the section.

     The auditors also initiated an administrative review of
purchase orders issued by the maintenance section.  The review
led to the discovery of discrepancies in the procurement process.
Numerous small purchase contracts for similar types of work were
awarded within a short period of time.  This raised the suspicion
that the section was "parceling" contracts, or dividing a single
job worth more than $25,000 into multiple jobs below that amount,
thereby avoiding the need for a stringent, sealed bidding
process.  The auditors noted a large percentage of work was being
given to the same sixteen contractors.  The sixteen contractors
included six companies owned by Furukawa and Uemura, as well as
companies owned by cooperating witnesses Inada, Hirota, Shiosaki,
Shimotsukasa and Yoshida.  During the fiscal years ending June
30, 1997 and 1998, the sixteen contractors received $863,593, or
approximately 21.5% of the total airport maintenance budget.  In

19

the fiscal year ending June 30, 1999, the amounts increased
dramatically.  During that year, the sixteen contractors obtained
$4,534,287, or approximately 62.8% of the airport maintenance
budget.

By February 2002, the auditors had turned their focus
to whether the amounts paid on specific trouble calls were
excessive.  When they could not locate a particular trouble call
of interest, they went to Shibuya's desk to locate the missing
information.  The auditors found the missing trouble call, plus
other trouble calls.  The trouble calls had post-it notes on them
with the names of contractors.  Shibuya also had requisition
forms with the names of vendors already filled out, without any
description of the work or amounts to be charged.  The auditors
took the documents and turned them over to investigators from the
State Attorney General's office.

In June 2002, State investigators executed search
warrants at various locations at the airport.  Hirokawa was
arrested on June 25, 2002, and Okada was arrested on July 3,
2002.

As the investigation became known, defendants Furukawa,
Uemura, Hirokawa and Okada had various meetings with co-
conspirators Shibuya, Inada and Shiosaki.  During the meetings,
Furukawa suggested that the others not make statements to the
State investigators.  Furukawa also told Yoshida to contact the
two other automotive body repair shops to convince them to tell

20

investigators that their quotations (which were higher than

Yoshida's) were legitimate.  At these meetings, Okada also said

he would be contacting politicians with some influence, and

implied that he would attempt to stop the investigation.

III. APPLICABLE LAW

    A.   Conspiracy

       To prove a conspiracy under 18 U.S.C. § 371, "the

government must establish (1) an agreement to engage in criminal

activity, (2) one or more overt acts taken to implement the

agreement, and (3) the requisite intent to commit the substantive

crime."  United States v. Johnson, 297 F.3d 845, 868 (9th Cir.

2002), citing United States v. Nelson, 66 F.3d 1036, 1044 (9th

Cir. 1995).  The agreement need not be explicit; an implicit

agreement may be inferred from the facts and circumstances of the

case.  United States v. Hernandez, 876 F.2d 774, 777 (9th Cir.),

cert. denied, 493 U.S. 863 (1989).

       An overt act is an act in furtherance of the object of

the conspiracy.  The act need not be illegal.  United States v.

Monroe, 552 F.2d 860 (9th Cir.), cert. denied, 431 U.S. 972

(1977).  The government need not prove all of the overt acts

charged in the indictment, or that each defendant committed an

overt act.  It is sufficient if there was an agreement to

accomplish an illegal objective, and one of the parties to the

agreement committed an overt act to implement the agreement.

       Conspiracy is a continuing offense.  United States v.

21

Castro, 972 F.2d 1107, 1112 (9th Cir. 1992).  A defendant "may join a conspiracy already formed and in existence, and be bound by all that has gone before in the conspiracy, even if unknown to him."  United States v. Umagat, 998 F.2d 770, 772 (9th Cir. 1993), quoting United States v. Bibbero, 749 F.2d 581, 588 (9th Cir. 1984), cert. denied, 471 U.S. 1103 (1985).  The government must only show that a defendant's understanding of the existing conspiracy "was of sufficient scope to warrant the conclusion that he embraced the common purpose of the conspiracy."  Id.  A conspiracy is presumed to continue "until there is affirmative evidence of abandonment, withdrawal, disavowal or defeat of the object of the conspiracy."  Castro, 972 F.2d at 1112.

Once the existence of an agreement is shown, only a "slight connection" is necessary to link a particular defendant to the conspiracy.  United States v. Restrepo, 930 F.2d 705, 709 (9th Cir. 1991).  A conspirator need not have detailed knowledge of the entire scope of the agreement or its goals, the role played by each member, or the division of the spoils.  United States v. Beecroft, 608 F.2d 753, 757 (9th Cir. 1979); United States v. Escalante, 637 F.2d 1197 (9th Cir.), cert. denied, 449 U.S. 856 (1980).  In fact, a party to a conspiracy need not even know the identity, or even the number of his confederates.  United States v. Hobson, 519 F.2d 765 (9th Cir.), cert. denied, 423 U.S. 931 (1985).

A single conspiracy can be established even though it

22

took place over a long period of time during which new members joined, and old members dropped out.  United States v. Green, 523 F.2d 229, 233 (2d Cir. 1975), cert. denied, 423 U.S. 1074 (1976). See also United States v. Thomas, 586 F.2d 123, 132 (9th Cir. 1978)(proof that defendant "knew he was plotting in concert with others to violate the law was sufficient to raise the necessary inference that he joined in the overall agreement"); United States v. Perry, 550 F.2d 524, 528 (9th Cir.)(law of conspiracy does not require the government "to prove that all of the defendants met together at the same time and ratified the illegal scheme"), cert. denied, 431 U.S. 918, 434 U.S. 827 (1977).

　　　　Participation in a criminal conspiracy need not be proven by direct evidence.  The common purpose and plan may instead be inferred from a collection of circumstances.  Glasser v. United States, 315 U.S. 60, 80 (1942); United States v. Weaver, 594 F.2d 1272, 1274 (9th Cir. 1979).

　　B.  Co-Conspirator Statements

　　　　Under Fed. R. Evid. 801(d)(2)(E), a statement made by a conspirator during the course and in furtherance of the conspiracy is not hearsay, and is admissible against other members of the conspiracy.  United States v. Segura-Gallegos, 41 F.3d 1266, 1271-72 (9th Cir. 1994).  The requirements for admission of a co-conspirator statement under Fed. R. Evid. 801(d)(2)(E) "are identical to the requirements of the Confrontation Clause."  United States v. Bridgeforth, 441 F.3d

23

864, 868-69 (9th Cir. 2006), citing <u>Bourjaily v. United States</u>,
483 U.S. 171, 182 (1987).  The government must show the following
preliminary facts to allow the admission of a co-conspirator
statement: (1) there was a conspiracy, (2) the defendant and
declarant were participants in the conspiracy, and (3) the
statement was made by the declarant during, and in furtherance
of, the conspiracy.  <u>Id.</u> at 869.  "These preliminary
determinations are made by the court, not the jury, pursuant to
Fed. R. Evid. 104(a)."  <u>United States v. Gil</u>, 58 F.3d 1414, 1420
(9th Cir. 1995), citing <u>United States v. Fleishman</u>, 684 F.2d 1329
(9th Cir.), <u>cert.</u> <u>denied</u>, 459 U.S. 1044 (1982).  The court's
determinations of whether a conspiracy existed and whether
statements were made in furtherance of the conspiracy are
reviewed for clear error.  <u>United States v. Gil</u>, 58 F.3d 1414,
1419 (9th Cir. 1995), <u>cert.</u> <u>denied</u>, 516 U.S. 969 (1995), citing
<u>United States v. Arambula-Ruiz</u>, 987 F.2d 599, 607 (9th Cir.
1993).  The court's admission of co-conspirator statements is
reviewed for an abuse of discretion.  <u>United States v. Garza</u>, 980
F.2d 546, 553 (9th Cir. 1992).

        In this case, the government will offer numerous oral
statements of various defendants as co-conspirator statements.
The government will also offer evidence that Hirokawa gave
supervising inspector Harry Shibuya trouble calls with "post-it"
notes identifying the contractors who should be given the work.
Shibuya will testify that he was familiar with Hirokawa's

24

handwriting, and recognized the post-it notes as being authored
by him.  These notes caused Shibuya to direct work to contractors
who ultimately inflated their invoices and paid kickbacks for the
work.  The notes thus are admissible as co-conspirator statements
of Hirokawa in furtherance of the conspiracy.  C.f. <u>United States</u>
<u>v. Larson</u>, ___ F.3d ___, 2006 WL 2466872, *7 (9th Cir. August 28,
2006) (to be "in furtherance of" conspiracy, statements must
"further the common objectives of the conspiracy or set in motion
transactions that are an integral part of the conspiracy").

    C.  <u>Mail Fraud</u>

        1.  <u>Scheme to Defraud</u>

        To convict a defendant of mail fraud, the government
must prove that the defendant "(1) participated in a scheme with
the intent to defraud, and (2) the scheme used or caused the use
of the mails in furtherance of the scheme." <u>United States v.</u>
<u>Montgomery</u>, 384 F.3d 1050, 1063 (9th Cir. 2004), quoting <u>United</u>
<u>States v. Johnson</u>, 297 F.3d 845, 870 (9th Cir. 2002).

        The first element requires proof that a defendant had a
specific intent to defraud.  An intent to defraud is an intent to
deceive or cheat.  <u>United States v. Shipsey</u>, 363 F.3d 962, 967
(9th Cir.), <u>cert. denied</u>, 543 U.S. 1004 (2004).  Such an intent
may be shown if (1) a defendant knowingly made false
representations, or (2) the scheme was reasonably calculated to
deceive persons or ordinary prudence and comprehension.  <u>United</u>
<u>States v. Beecroft</u>, 608 F.2d 753, 757 (9th Cir. 1979).  Direct

25

proof of an intent to defraud is not necessary.   It may be
inferred from a defendant's statements and conduct.   United
States v. Sayakhom, 186 F.3d 928, 941 (9th Cir. 1999).
Fraudulent intent may also be shown by the scheme itself.   United
States v. Bohonus, 628 F.2d 1167, 1172 (9th Cir.), cert. denied,
447 U.S. 928 (1980).  "Fraudulent intent may be, and often must
be, proven by circumstantial evidence." United States v.
Rasheed, 663 F.2d 843, 848 (9th Cir. 1981), cert. denied, 454
U.S. 1157 (1982), citing United States v. Piepgrass, 425 F.2d
194, 199 (9th Cir. 1970).   "Deceitful statements or half truths
or the concealment of material facts is actual fraud under the
mail fraud statute." Sayakhom, 186 F.3d at 941.

     The false statements or omissions must be material.
Neder v. United States, 527 U.S. 1 (1999).  A statement is
material if "it is made to induce action or reliance by another,"
or has "a natural tendency to influence, or is capable of
influencing another's decisions." United States v. LeVeque, 283
F.3d 1098, 1103-04 (9th Cir. 2002).

     When a scheme to defraud is shared by two or more, it
becomes a conspiracy, and the rules of evidence are the same as
where a conspiracy is charged, Robinson v. United States, 33 F.2d
238, 240 (9th Cir. 1929), and the act of each schemer in
furthering the common scheme is the act of all.  See Davis v.
United States, 12 F.2d 253, 257 (5th Cir.), cert. denied, 271
U.S. 688 (1926).  So long as an act is within the general scope

26

of the scheme in which all defendants embarked, a defendant need not be directly connected with a particular fraudulent act to be held responsible.  United States v. Federbush, 625 F.2d 246, 253-254 (9th Cir. 1980).  Each defendant need not participate in every act of his co-schemers, but only in the overall scheme to defraud.  United States v. Jones, 425 F.2d 1048, 1057 (9th Cir.), cert. denied, 400 U.S. 823 (1970).  The government need only prove that each defendant was a knowing participant in an ongoing scheme to defraud that used the mails.  United States v. Diggs, 649 F.2d 731, 736 (9th Cir.), cert. denied, 454 U.S. 970 (1981); United States v. Price, 623 F.2d 587, 591 (9th Cir.), cert. denied, 449 U.S. 1016 (1980); United States v. Farris, 614 F.2d 634, 639 (9th Cir. 1979), cert. denied, 447 U.S. 926 (1980); Levey v. United States, 92 F.2d 688, 691 (9th Cir. 1937), cert. denied, 303 U.S. 639 (1938).  Each co-schemer is responsible for the acts and declarations by a co-schemer in furtherance of the common scheme, whether or not he knew of or agreed to any specific use of the mailing.  United States v. Craig, 573 F.2d 455, 482 (7th Cir. 1977), cert. denied, 439 U.S. 820 (1978); United States v. Wilson, 506 F.2d 1252, 1257 (7th Cir. 1974).

        Generally, a conviction for a fraud scheme narrower than, but fully included within, the scheme set forth in an indictment satisfies the indictment so long as the crime and the elements that sustain the conviction are fully set out in the indictment.  United States v. Miller, 471 U.S. 130 (1985).

27

In this case, the government will prove that the defendants collectively engaged in a scheme to defraud. The scheme consisted of rigging the bid process for small purchase contracts at the airport. Furukawa and Uemura submitted a package of three bids on each job which they were awarded. Two of those bids were bogus, and were made solely to give the false appearance that the jobs were being competitively awarded in accordance with State procurement laws, and that the value of the contracts was reasonable. In fact, the winning contractor had been preselected on each job, and there was no competition whatsoever, which allowed the contractor to inflate his prices.

## 2. <u>Mailings in Furtherance of the Scheme</u>

The gist of mail fraud is the use of the United States mails in furtherance of the scheme to defraud. A mailing must be made, or caused to be made, "for the purpose of executing the scheme." <u>United States v. Maze</u>, 414 U.S. 395, 400 (1974). The government need not prove that a defendant specifically intended that the mails be used. An individual "causes" the use of the mails for mail fraud purposes if he "does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended." <u>Pereira v. United States</u>, 347 U.S. 1, 8-9 (1954); <u>United States v. Bernhardt</u>, 840 F.2d 1441, 1447 (9th Cir.), <u>cert.</u> <u>denied</u>, 488 U.S. 954 (1988). The use of the mails "may be established circumstantially or by proof of

28

general custom." United States v. Brackenridge, 590 F.2d 810, 811 (9th Cir. 1979)(testimony from bank manager that requests in question would generate mailing sufficient to prove mailing of check).

"A mailing itself need not itself be false to be in furtherance of a scheme to defraud, nor need it be 'essential' to the scheme. Rather, the mailing must be 'closely entwined' with or 'closely related' to the scheme." United States v. Benny, 786 F.2d 1410, 1420 (9th Cir.), cert. denied, 479 U.S. 1017 (1986)(citations omitted). "A mailing is sufficiently closely related to the fraudulent scheme if it is 'for the purpose of executing the scheme' or 'incident to an essential part of the scheme.'" United States v. Serang, 156 F.3d 910, 914 (9th Cir.), cert. denied, 525 U.S. 1059 (1998), citing United States v. Hubbard, 96 F.3d 1223, 1227-28 (9th Cir. 1996). "In other words, the mailing must be a 'step in the plot.'" Id., quoting Schmuck v. United States, 489 U.S. 705, 711 (1989).

In this case, each mailing consists of the mailing of a State check to Furukawa or Uemura as payment for work done under a small purchase contract. The defendants plainly contemplated that the State would pay Furukawa and Uemura's fraudulently inflated invoices. The scheme was not complete until Furukawa and Uemura received the checks. The mailing of the checks thus was sufficiently related to the scheme for mail fraud purposes.

29

IV.  <u>EVIDENTIARY ISSUES</u>

The government does not believe this case involves any unusual evidentiary issues.  The government will introduce voluminous documentary evidence consisting of trouble calls, photographs, bids, requisitions, purchase orders, records of payments, and checks.  Most of that evidence will be offered either through records custodians or stipulations.

Dated: Honolulu, Hawaii, September 12, 2006.

EDWARD H. KUBO, JR.
United States Attorney
District of Hawaii


<u>/s/ Lawrence L. Tong</u>
LAWRENCE L. TONG
Assistant U.S. Attorney
LAWRENCE A. GOYA
Special Assistant U.S. Attorney

30

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that, on the dates and by the methods of service noted below, the true and correct copy of the foregoing was served on the following at their last known address:

Served electronically through CM/ECF:

CLIFFORD B. HUNT, ESQ.                September 12, 2006
notguilty007@msn.com

Attorney for Defendant
WESLEY UEMURA


DANA S. ISHIBASHI                     September 12, 2006
ishibashi@aol.com

Attorney for Defendant
RICHARD OKADA


HOWARD K.K. LUKE, ESQ.               September 12, 2006
howardkkluke@hawaii.rr.com

Attorney for Defendant
MICHAEL FURUKAWA


Served by first class mail:

KEITH S. SHIGETOMI, ESQ.             September 12, 2006
711 Kapiolani Blvd., Suite 1440
Honolulu, HI 96813

Attorney for Defendant
DENNIS HIROKAWA


DATED:  Honolulu, Hawaii, September 12, 2006.


                              /s/ Janice Tsumoto